743 P.2d 61

**Mary E. LUNA & Jesus Luna, husband and wife,**
**Plaintiffs-Appellants-Cross-Respondents,**

v.

**SHOCKEY SHEET METAL & WELD-ING COMPANY, a corporation,**
**Defendant-Respondent-Cross-Appellant,**

and

**Does 1–10, Defendants.**

**No. 16473.**

Supreme Court of Idaho.

June 2, 1987.

Rehearing Denied Sept. 30, 1987.

Randolph C. Stone and Richard K. Smith, Parsons, Smith, Stone & Fletcher, Burley, for plaintiffs-appellants-cross-respondents.

R.B. Rock and Mark S. Prusynski, Moffatt, Thomas, Barrett & Blanton, Boise, for defendant-respondent-cross-appellant.

HUNTLEY, Justice.

Mary and Jesus Luna appeal a jury verdict finding Shockey Sheet Metal not liable for injuries suffered by Mary Luna while working at Ore-Ida Foods, Inc. (not a party). Mrs. Luna was sprayed by exploding hot oil and severely burned while working near a fryer manufactured by Shockey Sheet Metal according to plans and specifications provided by Ore-Ida. The Lunas argue that the trial court erroneously informed the jury that joint and several lia-

bility was to apply and its implications could therefore be considered by the jury. Shockey Sheet Metal cross-appeals, arguing that the trial court erred by not granting its motions for summary judgment and directed verdict, alleging that there was no evidence of negligence by Shockey Sheet Metal and the theories of strict liability and implied warranty could not, as a matter of law, apply in the instant case.

## STATEMENT OF FACTS AND PROCEEDINGS

Mary Luna was employed at the Ore-Ida plant in Burley, Idaho, controlling foam coming from "blanchers" by the use of either a "defoaming agent" or oil drawn from a "new oil line." The defoaming agent was more effective in controlling foam, but Ore-Ida had not provided enough of the agent, and had not responded to employee requests for more. Consequently, the employees would use the new oil line located next to a fryer to control the foam. On February 10, 1982, for an unknown reason, the oil in the fryer next to the new oil line was jumping in a way that Mary Luna had not seen in her five years at Ore-Ida. As she tried to run away, the oil burst out of the fryer and sprayed onto her, causing extensive burns and permanent scarring.

The three-stage fryer which caused the accident was relatively new and had been manufactured by Shockey Sheet Metal according to plans and specifications from Ore-Ida. Shockey Sheet Metal had assisted in the installation of the fryer, which installation was at all times supervised and controlled by Ore-Ida.

Mary and Jesus Luna filed suit against Shockey Sheet Metal (but not Ore-Ida) under theories of strict liability (design and manufacturing defects and failure to warn), negligence, and breach of the implied warranties of merchantability and fitness for a particular purpose. Shockey Sheet Metal moved for summary judgment, arguing that there was insufficient evidence of a manufacturing defect to go to the jury; that Shockey Sheet Metal could not be held liable for a possible design defect, as the fryer was designed by Ore-Ida; that there was no evidence that Shockey Sheet Metal had knowledge of a defect so as to indicate a failure to warn; that there was no evidence of negligence on the part of Shockey Sheet Metal; and that there was no privity between Luna and Shockey, as required to implicate warranty theories. The trial court denied the motion for summary judgment, ruling that it was unclear whether Shockey Sheet Metal had provided any engineering or design services in connection with the fryers it manufactured for Ore-Ida; that Luna did allege a manufacturing defect in the complaint; that, at that stage of the proceedings, no one was certain of the cause of the accident; and that the court could not yet rule whether Shockey Sheet Metal was unaware of all potential dangers which existed for the operators of the fryers as such would relate to a duty to warn. The trial court further ruled as to negligence, that case law indicated that contractors of another's design could be liable for a dangerous defect in the design if the design were "so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe." Restatement (Second) of Torts, § 404 comment a. Due to the danger potential inherent when hot oil and water are in close proximity, the trial court held that the issue of negligence should also be before the jury. As to breach of warranty theories, the trial court looked to I.C. § 28-2-318, also known as "Alternative A" of § 2-318 of the UCC. The trial court noted that if Luna could not claim the benefit of an implied warranty for personal injuries as against "seller" Shockey Sheet Metal, basically no one in the "buyer" Ore-Ida corporation could, undermining the very purpose behind implied warranty theories.

During trial, evidence was presented that: Shockey manufactured and sold the fryer; that Shockey knew Ore-Ida intended to place the fryer in an area where water was extensively used; that Shockey knew that if water got into the hot fryer it posed an extreme danger, but that Shockey did not consider warning anticipated users of

the fryer. After the evidentiary phase of trial, the court gave Instruction No. 53 to the jury:

> If you find that defendant Shockey Sheet Metal and Welding Company's contribution to the cause of the accident exceeds the plaintiff's contribution to the cause of the accident, in addition to recovery for the percentage of damages caused by Shockey Sheet Metal and Welding Company, the plaintiffs may be allowed to recover from Shockey Sheet Metal and Welding Company some or all of the plaintiff's damages including that percentage, if any, caused by Ore-Ida.
>
> If you find that Shockey Sheet Metal and Welding Company's contribution to the cause of the accident, if any, is equal to or less than the plaintiff's contribution to the cause of the accident, if any, or if you find that Ore-Ida is solely responsible for the accident, then the plaintiffs will recover nothing from Shockey Sheet Metal and Welding Company.

The Lunas moved for mistrial on grounds that Instruction No. 53 erroneously allowed the jury to choose not to apply the law of joint and several liability; that the jury was misinformed as to the effect its verdict could have; and that the instruction improperly directed the jury to a consideration of who would pay the judgment. The motion was denied. Shockey Sheet Metal moved for a directed verdict at that time, which motion was also denied.

The jury returned a special verdict form finding that defendant Shockey Sheet Metal was not negligent and did not manufacture or sell the fryer in a defective and unreasonably dangerous condition; that Shockey did not breach the implied warranties of merchantability or fitness for a particular purpose; and that Shockey Sheet Metal did not negligently fail to warn of any dangers of which it should have been aware. The Lunas and Shockey Sheet Metal then filed their respective appeals.

We address first the propriety of the trial court's Instruction No. 53 on the applicability of joint and several liability and

second, the propriety of the trial court's award of discretionary costs. A discussion of the merit of Shockey Sheet Metal's cross-appeal will not be necessary in view of our resolution of the first issue.

## THE INSTRUCTION ON JOINT AND SEVERAL LIABILITY

The concept of joint and several liability is a legal principle of long-standing in Idaho. *Shields v. Martin*, 109 Idaho 132, 706 P.2d 21 (1985); *Odenwalt v. Zaring*, 102 Idaho 1, 624 P.2d 383 (1981); *Tucker v. Union Oil Co. of California*, 100 Idaho 590, 603 P.2d 156 (1979).[1]

> This court has long held that when tortious acts of several parties concurrently cause an injury, each tortfeasor is liable for the whole of the damage. (Citations omitted). As stated in *Seattle First National Bank v. Shoreline Concrete, supra* [91 Wash.2d 230, 588 P.2d 1308 (1978)]: "Joint and several liability is premised upon causation and indivisibility of the *harm* caused." *Tucker, supra,* 100 Idaho at 600, 603 P.2d at 166.

Idaho Code § 6-803(3) generally limits consideration of the relative degrees of fault of joint tortfeasors to the question of contribution between themselves.

> We also hold that a limitation of liability based on proportionate fault, ... would be inconsistent with I.C. § 6-803(3) which provides: When there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro-rata share *solely for the purpose of determining their rights and contribution among themselves, each remaining severally liable to the injured person for the whole injury as at common law.* *Tucker,* 100 Idaho at 598–599, 603 P.2d at 164. (Emphasis supplied).

The Lunas argue that Instruction No. 53 improperly allowed the jury to disregard

---

1. Senate Bill 1223, 1987 Idaho Session Laws, Chapter 278, effective as law July 1, 1987, addresses the applicability of the doctrine of joint and several liability.

the law of joint and several liability by adjusting its findings in order to achieve a certain result in the award of damages. The Lunas point to the following language from Instruction No. 53 as particularly inappropriate:

... in addition to recovery for the percentage of damage caused by Shockey Sheet Metal and Welding Company the plaintiffs may be allowed to recover from Shockey Sheet Metal and Welding Company some or all of the plaintiffs' damages including that percentage, if any, caused by Ore-Ida.

The Lunas argue that the instruction misrepresented the law by stating that the jury could apportion which degree of causation was attributable to Shockey Sheet Metal and which, if any, was attributable to Ore-Ida when, in fact, under the law of joint and several liability, harm is not divisible. Additionally, the Lunas argue that by directing the jury to a consideration of who will pay the judgment, the trial court was implicitly condoning the tailoring of findings to achieve the desired award, thereby subverting the jury process.

In addition to those policy concerns, the Lunas cite to our holding in *Holland v. Peterson*, 95 Idaho 728, 518 P.2d 1190 (1974), wherein we held:

The general rule, and the one we adopt today, is that it is reversible error for the trial court to instruct the jury as to what the effect their answers will have on the final outcome of the case. *Holland*, 95 Idaho at 732, 518 P.2d at 1194.

As an aid in determining whether Instruction No. 53 contravenes our holding in *Holland, supra,* and allows for jury misconduct, both the Lunas and Shockey Sheet Metal invite our attention to *Seppi v. Betty*, 99 Idaho 186, 579 P.2d 683 (1978). In *Seppi*, we fashioned an exception to the general rule in *Holland,* by allowing the trial court to apprise the jury of the workings of the concept of comparative negligence (i.e., how that concept operates to determine a prevailing party). In *Seppi*, we expressed our belief that, "[i]rrespective of whether one considers it a virtue or a vice, the tendency of juries to adjust their

verdicts to accord with their notions of the justice of the cause is an inherent characteristic of juries and will be with us as long as we continue to have juries." *Seppi*, 99 Idaho at 193, 579 P.2d at 690. We then went on to hold that, in the comparative negligence context, it was better to equip jurors with knowledge of the effect of their findings than to let them speculate in ignorance "and thus subvert the whole judicial process." *Seppi*, 99 Idaho at 193, 579 P.2d at 690. We noted that Idaho's comparative negligence rule, which bars recovery when the plaintiff's negligence is 50% or more, "poses a trap for the uninformed jury." And, therefore, "a jury, not knowing the critical importance Idaho law places on a finding of 50% negligence, may reach such a verdict too quickly and without carefully examining the facts." *Seppi*, 99 Idaho at 193, 579 P.2d at 690.

In short, not informing the jury of the effect of a 50% negligence finding in many cases is likely to cause an unjust result and produce a judgment which does not reflect the wisdom of the jury or their view of the facts, but only their ignorance of Idaho law. *Seppi*, 99 Idaho at 194, 579 P.2d at 691.

Similarly, the doctrine of joint and several liability, under which a defendant assessed a mere 1% negligence may be required to pay 100% of plaintiff's damages if, for some reason, the joint tortfeasor is unreachable through the judicial process, "poses a trap for the uninformed jury." An informed jury will be much more likely to carefully examine the facts prior to reaching a verdict holding a defendant even 1% at fault, no matter how cosmetically appealing a partial allocation of fault might be.

In *Kaeo v. Davis*, 719 P.2d 387 (Hawaii 1986), the Hawaii Supreme Court, relying in part upon our holding in *Seppi*, held that, if requested and under appropriate circumstances, the trial court *should* inform the jury of the possible legal consequences of a verdict apportioning negligence among joint tortfeasors. The *Kaeo* court determined that it was more desirable for the courts to explain the operation

of the law to the jury than to perpetuate a system which encourages mistaken speculation by ignorant jurors.

 In view of the reasoning in *Seppi* and *Kaeo,* as well as our belief that the doctrine of joint and several liability does, in fact, "pose a trap" to an ill-informed jury, it is appropriate for the trial courts to inform the jury of the effect their findings may have under an application of the doctrine of joint and several liability. While so holding, we do not overrule *Holland v. Peterson, supra,* as that case continues to state the general rule regarding issues which do not require articulation to avoid hidden or obscure pitfalls. Further, we do not mandate that the trial courts inform the jury of the legal effect of their findings in all cases where the doctrine of joint and several liability is implicated. Instead, as in *Seppi,* we grant the trial court discretion as to whether or not to inform the jury of the legal effect of its findings, contingent upon whether the trial court believes an instruction might confuse or mislead the jury. In the instant case, the giving of Instruction No. 53 was not reversible error.[2]

 In a related argument, the Lunas contend that counsel for the defense made several improper statements regarding Instruction No. 53, in effect enticing the jury to manipulate its determination of negligence and change its award of damages. The statement at issue reads as follows:

> Now, that means if you found Ore-Ida 97% responsible for this accident, Mary Luna 1% and Shockey 2%, all or some of this 97% attributed to Ore-Ida can be recovered from Shockey. Now, that's the law. If that's what you think is the correct result in this case, then so be it. You just have to make that decision, but you ought to be aware of that effect ...
> If they (Ore-Ida) can do all those things, and Shockey has to pay the whole freight, that doesn't encourage them (Ore-Ida) to be safe. If you want to send a message to Ore-Ida, then what you

ought to do is find 100% cause of this accident on the part of Ore-Ida. If you really believe that's what happened. [Sic] And you're not sending any kind of message to be safe in the operation of a fryer if you make Shockey pay for their mistakes.

We find no impropriety in the above statement. Defense counsel neither misstated the law nor argued with the merits of the law. Instead, the jury had the law and its effect explained to them. It is entirely consonant with our holding today to permit such argument, as it furthers an underlying goal of encouraging careful, informed deliberations by juries rather than well-meaning, but often misguided, speculation.

## THE DISCRETIONARY COST AWARDS

 Shockey Sheet Metal submitted a memorandum and supplemental memorandum of costs requesting discretionary costs for photographs totaling $564.68 and for photocopies totaling $322.25. The Lunas objected and submitted an affidavit which stated in relevant part:

> There has been no showing with which to support a finding that any of the discretionary costs claimed were reasonable or necessary.

The trial court entered an award for both the photography and photocopying costs in the full amounts requested. The applicable Rule of Civil Procedure is I.R.C.P. 54(d)(1)(D), provides in part:

> [Discretionary costs] may be allowed upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party. The trial court, in ruling upon objections to such discretionary costs ... shall make express findings as to why such specific item of discretionary cost should or should not be allowed.

The Lunas argue that the trial court failed to enter specific findings as required

---

**2.** Even had Instruction No. 53 been erroneous, its tender would have constituted harmless error given that the jury found absolutely no negligence for which Shockey was liable, their verdict and statements evidencing that, instead, they believed a non-party to be at fault.

by I.R.C.P. 54(d)(1)(D) and that Shockey Sheet Metal did not submit an affidavit averring the reasonableness and necessity of the claimed discretionary costs.

The record shows that Shockey Sheet Metal did submit a notarized affidavit following its supplemental memorandum of costs stating "that the items in the above bill are true and correct and that they have been reasonably and necessarily incurred in the defense of this action; ...." The supplemental memorandum of costs further details what the photocopies and photographs were used for, as well as each item's cost. Additionally, the trial court made specific findings that the photographs and photocopies were used by both sides and that both the photography and photocopying expenses were "appropriate" and "not unreasonable." We hold that there was no abuse of discretion by the trial court in awarding costs for defendant's photocopying and photography expenses.

### THE CROSS-APPEAL

In view of our decision upholding the propriety of the trial court's instruction to the jury on the effect of its findings given the applicability of joint and several liability, and in view of the jury's verdict totally exonerating Shockey Sheet Metal from any liability whatsoever and finding no fault on Shockey Sheet Metal's behalf, the issues of whether the trial court ruled appropriately in denying Shockey Sheet Metal's motions for summary judgment and directed verdict are moot.

Costs to respondent/cross-appellant, no attorney fees awarded.

SHEPARD, C.J., and DONALDSON and BAKES, JJ., concur.

BISTLINE, Justice, dissenting.

It may be that it is late in the term, for which reason my powers of comprehension are not at full strength—which I say in view of my inability to agree with the majority's express approval of the closing summation of Shockey's counsel as set out in the majority opinion at p. 65. Here

was a case where any jury would arrive at a very substantial damage figure. The jury never had to reach that question, which was contained in questions numbered 26 and 27 of the special verdict form, because it was instructed to not proceed beyond the first four questions if all were answered "no." Those questions were as follows:

QUESTIONS NO. 1. Was defendant Shockey negligent in connection with the fryer?

ANSWER: Yes___ No _X_

QUESTION NO. 2. Was the fryer manufactured or sold by defendant Shockey in a defective condition unreasonably dangerous to person or property?

ANSWER: Yes___ No _X_

QUESTION NO. 3. Did defendant Shockey breach any implied warranty of merchantability in connection with the fryer?

ANSWER: Yes___ No _X_

QUESTION NO. 4. Did defendant Shockey breach any implied warranty of fitness for a particular purpose in connection with the fryer?

ANSWER: Yes___ No _X_

If you answered "No" to each question in this section, then sign the verdict form and inform the bailiff that you are done. If you answered "Yes" to one or more of the questions in this section, you must answer all of the other questions to which the form directs you. R., pp. 381–82.

Argument of defense counsel, coupled with Given Instruction No. 53, majority opinion, p. 63, causes me considerable worry that the jury was confused or misled, or confused and misled. The majority approves the instruction as well as the use made of it by defense counsel. Its theme appears to be that the jury should be made aware of the financial effect which its answer to the 26 questions will have on the *parties* whose negligence is at issue. But, Ore-Ida, upon whom Shockey would place all of the blame, was not even a party, and it will not be affected in any manner by those answers. It has settled its obligations to

Mary Luna under the Workmen's Compensation Law. Unlike the phantom defendants of years gone by, Ore-Ida is a *known* (non)defendant. How sweet it must have been for defense counsel, armed with Instruction No. 53, to have liberty to urge upon the jury: If Ore-Ida can do all those [negligent] things, and Shockey has to pay the *whole* freight, *that* doesn't encourage Ore-Ida to be safe. *If you want to send a message to Ore-Ida, then what you ought to do is find 100 percent cause of this accident on the part of Ore-Ida.* Which is precisely what the jury did do, and which is readily discernible. Of 100 percent of liability, Shockey was quickly assessed none. One hundred take away zero leaves one hundred percent for Ore-Ida, which corporation was not a party in court defending itself. The special verdict form would have allowed the jury, had it not been directed to discontinue answering the court's questions, to pass upon the *assumption of the risk* by Mary Luna, and the *negligence* of Mary Luna. I submit that the record and the law would not have sustained a jury finding that she was negligent, or that she assumed the risk of getting burned by an occurrence which was not of her doing, and that the jury would have totally absolved her. Again, 100 percent of total fault, take away Mary Luna's zero percent, leaves 100 percent for Ore-Ida.

This jury was by judge and defense counsel invited to return a swift verdict—a swift message for Ore-Ida, and it did so. BUT, as Paul Harvey says, in a few minutes, I will return with the rest of the story.

And here it is. That jury, which the majority says was only being properly enlightened, was never told that its message to Ore-Ida was meaningless and a futile gesture—that Ore-Ida's liability to Mary Luna was only that which would accrue against it under the laws of workmen's compensation. Nor was the jury told that under the case law of this state,[1] whatever she might recover from Shockey's would have deducted from it all that she had received from her workmen's compensation coverage under her employment with Ore-Ida.

The record probably indicates that Ore-Ida should have borne more of the fault than Shockey's, but nothing justified anyone in suggesting that Shockey's fault was at two percent, and Mary Luna's fault was at one percent. The trial court, in denying a motion for summary judgment, ruled that Shockey's causative fault was a jury question. The jury instead sent a message to Ore-Ida.

Unlike the Paul Harvey stories, the jury got only half the story. The majority may be on the right track in wanting juries to be informed—but the destination will not be reached until the jury is wholly informed rather than supplied with partial confusing disinformation, as was done here.

BISTLINE, J., dissenting on denial of Petition for Rehearing.

The petition for rehearing and supporting brief concede that much of the Court's opinion is not questioned. Two issues are raised. One is peculiar to this case, and in my view deserving of reconsideration. The other is a recurring question, and one with which the Court should now come to grips. Because it is recurring, it will simply not go away. It has to do with the constantly incurred expenses of litigation, the granting of costs, challenges thereto, and the settling thereof. There is no formula for the latter, and much of it depends upon accuracy and credibility. Some cost bills are in excess of amounts sought in some tort and contract litigation.

---

1. *Tucker v. Union Oil Co. of California, [Collier Carbon and Chemical Corp., Dover Corp., P–T Coupling Co., Inc., E.D. Bullard Co., Paul Roberts Co., Graybill Wholesale Co., and Intermountain Equipment Co.],* 100 Idaho 590, 603 P.2d 156 (1979). In that case, the plaintiffs' assessed proportionate share of fault was ten percent. His employer, Feed Services, Inc., was a nonparty to the action. It was assessed 30 percent fault, and Collier Carbon was awarded the balance of 60 percent fault. The trial court, The Honorable Edward J. Lodge, did not favor Collier Carbon's counsel with an instruction no. 53. Had the court done so, defense counsel would have had a heyday, as here.

Because we have before us a concise ·brief presenting and arguing the two issues, upon which I cannot expect to improve, and so present them to the readers who may have had previous interest in this litigation:[1]

### APPENDIX

I. *Joint and Several Liability:* The Court's opinion addresses at length the policies supporting instructing the jury about the effect of joint and several liability. The opinion points out the Court's belief that the doctrine of joint and several liability poses a trap to an ill-informed jury.

The Lunas do not ask the court to reconsider that part of the opinion which expresses the policy nor the ruling that it is appropriate to instruct a jury of the effect of its findings under the principals of joint and several liability. What the Lunas would like the court to reconsider is whether Instruction No. 53 and the closing argument served the policy of informing the jury and avoiding the trap described by the .Court.

Instruction No. 53 and the argument not only left the trap in place, but potentiated it. The jury remained ill-informed. The instruction and argument did not actually advise the jury as to the effect of joint and several liability, but left them to speculate as to the actual result. The jury also became misinformed because Instruction No. 53 and the argument affirmatively suggested possible outcomes which were contrary to Idaho law.

The jury was forced to speculate, without any guidance by the court, whether Shockey would have to pay *"some or all"* of the Plaintiffs' damages. The jury could have concluded either. Under *Tucker vs. Union Oil Company of California,* 100 Idaho 590, 603 P.2d 156 (1979) and *Schneider vs. Farmers Merchant, Inc.,* 106 Idaho 241, 678 P.2d 33 (Idaho 1983), there was no legal possibility that Shockey would ever have to pay "all of the Plain-

tiffs' damages *including that percentage, if any, caused by Ore-Ida."*

Notwithstanding this legal impossibility, because the jury was forced to speculate, there was nothing to prevent them from reaching this improper conclusion as to the effect of Idaho law. The likelihood of this false conclusion was dramatically increased by counsel's closing argument strongly suggesting that Shockey was going to have to pay for all of the damages.

Having been thrown into the trap of having to speculate as to the result of their findings, with inaccurate information the jury was exposed to another trap. The inequitability of forcing Shockey to pay Ore-Ida's share was strongly argued. The jury had to figure out a way to get around a result suggested to be inequitable without any guidance by the court. How was the jury to avoid forcing Shockey to pay for all of the Plaintiffs' damages, including the damages caused by Ore-Ida? The only guidance came from closing argument.

A third trap was laid for the jury. Counsel argued to the jury that they should send a message to Ore-Ida. The jury wasn't instructed as to the effect of this message. They weren't told that the message to Ore-Ida did no good. They were allowed to fall into the trap of believing that their message to Ore-Ida would result in Mary Luna being compensated for her injuries. The comments of the jury foreman seemed to suggest that they fell into this trap.

It's one thing to state that the policy of the law favors that juries be fully informed of the consequences of their verdict. It's another thing to suggest that Instruction No. 53 serves that purpose. Use of language such as "may be allowed" and "some or all" patently require speculation. If the policy of the law is to avoid speculation how can language which requires speculation be sanctioned. The phrase "may be allowed" leaves the jury to speculate if when and to what extent it will be allowed. There is no guidance. The jury is just as

---

1. On the second issue a probable solution on contested cost and attorney fees issues would be for the Court to appoint a Master to preside over the dispute and recommend a determination to the Court. For certain I concede that we cannot hold ourselves out as being able to decide such issues merely on affidavits and counter affidavits.

likely to reach an incorrect conclusion as a correct one.

Similarly, use of the phrase "some or all" does not instruct the jury of the consequences of their verdict. They aren't told whether it is some. They aren't told whether it is all. They are left to speculate without any guidance. Under what circumstances will it be some? Under what circumstances will it be all? They have no way to know, yet they are called upon to reach some kind of a conclusion as to this issue. If the policy of the law favors that juries not be forced to speculate by being ill-informed, then Instruction No. 53 should not be set forth as an example of an instruction which serves the policy of the law.

If the policy of the law favors instructions that properly instruct juries as to the legal consequences of their decisions, then the Instructions should not contain express statements that certain results are possible when those results cannot happen under Idaho law. If it wasn't legally possible for Shockey to be forced to pay for "all" of Mary Luna's damages, including that percentage "caused by Ore-Ida", and by Mary for that matter, then how can an instruction stating that as a possibility be sanctioned? It's not a matter of a mere inartful use of language. The Instruction actually uses the term "all." Its not an innuendo contrary to law, its an express statement contrary to law.

Instruction No. 53 should not be set forth as an example of how juries should be instructed in Idaho. It should be set forth as an example of how juries should not be instructed. Speculation serves no purpose in a jury's deliberations. Instructions inviting speculation should be rejected in every case. Suggesting possible outcomes which are legally impossible serves no purpose in jury deliberations. Instructions making such suggestions should be rejected in every case.

Instruction No. 53 should not be published as a sanctioned instruction in Idaho. The ramifications of its approval run directly contrary to the policy enunciated by the Court in its original opinion. Juries should be properly and fully informed.

II. *Discretionary Costs*: The court's opinion holds that the record was sufficient to support the trial court's award of discretionary costs for photocopies and photography. In so ruling the court ruled that by meeting the verification requirements set forth in I.R.C.P. 54(d) for a memorandum of cost, a sufficient showing was made to meet the requirements of I.R.C.P. 54(d)(1)(D) which states:

(D) Discretionary Costs. Additional items of costs not enumerated in, or in an amount in excess of that listed in subparagraph (C), may be allowed upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party. . . .

The Lunas ask the court to reconsider the opinion regarding discretionary costs. The basis for the objection to the photocopies and photographs was that Lunas really had no idea what they were called upon to pay for. We don't know how many photocopies were made, nor why they were made, nor what was done with them. The Lunas don't know how much they were charged for each page of photocopying. If the charge was $.10 per page, then $323.35 represents 3,223 pages of photocopying. On the other hand if the charge was $1.00 per page it represents 322 pages of photocopying.

A similar problem exists with respect to the claim of photography. The Plaintiffs' have no way of knowing how the charge was arrived at or what it represents.

In addition to the Plaintiffs' interest in knowing what it is that they are called upon to pay, there are some policy implications which are not altogether favorable. If the costs are truly discretionary, then in the absence of some showing justifying the exercise of discretion, the award or disallowance of such costs by definition becomes arbitrary. There is no way of measuring whether or not the court abused its discretion. In the absence of a showing, there's no way of knowing what it is that the court relied upon.

Another dilemma arises when the only "showing" required is a memorandum of

costs complying with the rule. If the claiming party is not required to show what the discretionary costs were, how they were computed, why they were reasonable and necessary, then it is very difficult for the opposing party to challenge the claimed amounts. Short of subpoenaing adverse counsel and the supporting records, the only logical approach would appear to be stating that the showing was not sufficient. The Lunas did so in this case with an affidavit filed before consideration of their Motion to Disallow Costs. Even though Shockey was put to notice that the Lunas desired more information with respect to the claimed discretionary costs, they declined or failed to file such additional and supporting matters as would establish what it was that they were claiming.

The import of the court's decision is that this approach to challenging the claim for discretionary costs was not sufficient. If the opposing party desires to have any clarification, or to challenge the claim to discretionary costs, the only way to do so is to subpoena counsel signing the verification and his supporting documentation. It would seem a better approach to focus instead on the duty of the claiming party to establish proper foundation at the outset.

Petitioners' Brief, pp. 2–8.